EDWARD AVALOS CHIRIBEL, APPELLANT, *v.* SOUTHERN PACIFIC COMPANY, RESPONDENT.

No. 4576

June 27, 1963                                  383 P.2d 1

---

*Stewart, Horton & McCune,* of Reno, for Appellant.

*Woodburn, Forman, Wedge, Blakey, Folsom and Hug,* of Reno, for Respondent.

## OPINION

By the Court, BADT, C. J.:
The main question presented on this appeal is whether the trial court was justified upon the undisputed facts

in directing a verdict in favor of the defendant, respondent herein, on the ground that the plaintiff's actions constituted contributory negligence as a matter of law.

More precisely, the question might be thus expressed. Is a person who is injured while attempting to cross over the couplers between two railroad cars, in the middle of a busy switchyard, after dark, guilty of contributory negligence as a matter of law—the injury occurring when a switch engine, without signal by whistle or bell, started to move the cars? If so, was that negligence a proximate cause of the accident?

The accident occurred at approximately 8:10 p. m., on April 17, 1961, in the Reno switchyard of the Southern Pacific Railroad. Plaintiff lived in a small cabin near the tracks and had been living there for about two weeks prior to the accident. On the day of the accident plaintiff's own testimony shows that he had spent virtually the entire day drinking. According to him, it was dark when he chose to cross the switchyard. There was a string of cars blocking his way. He did not think it was a freight train, maybe just a yard train, but pretty long, and since he didn't hear any engines or noise and saw no lights, he figured, "well, I am going to cross over, you know. See, it was dark, I didn't want to walk clear over here. * * * So then I came over the ladder, I got hold of the ladder, you know, on my right hand car, you know, the car on my right hand. See, I got on the ladder, put my foot on that * * * steel step. So I got on and then I put my left, left foot on the inside ladder, you know, on the car on my left hand, and at that time I got hold of that brake rod with my right hand, see, and I turned around to put my foot on that coupler, you know, to jump right away, because I was afraid, you know, I was afraid—you could never tell when they might move it, but being that I didn't see no lights, I didn't hear no engines or nothing like that, no horn or nothing, I said, well,—but still, you know, I never take no chances like that. I don't know how I did that time, I mean. So I was ready to, you know, jump, you know what I mean, after I was, you know, on top, ready to cross, when there was a bang, you know, so of course

that caught me off balance. * * * I find myself between the rails under the train, * * * he started moving." His feet were crushed by the wheels. At the hospital a blood-alcohol test was made, about two hours after the accident, which revealed a reading of .330. Dr. Salvadorini testified that the reading indicated a very high degree of intoxication or drunkenness, resulting in a severe impairment of all bodily functions.

Esping, the railroad patrolman, testified that about 7:30 p. m., prior to the accident, he had found plaintiff very drunk, leaning against a boxcar in the switchyards. He escorted plaintiff for about two blocks and left him on the bank of an irrigation ditch, off the railroad property. Esping was the one who discovered plaintiff after the accident, but plaintiff denied that he ever saw Esping that night.

There is a conflict in the evidence whether any warning signals were given and the parties are not in agreement as to the interpretation of certain of respondent's rules requiring warning signals. However, since on a motion for directed verdict in favor of defendant the plaintiff is entitled to the benefit of all intendments resulting from such conflicts, we may assume for the purposes of this opinion that no warning signals were given and that the failure to give any signals was in violation of the company's rules. We may further assume for the purposes of this opinion that such failure was evidence of negligence on the part of the defendant.

A large part of the extensive briefs and a large part of the oral argument were devoted to a discussion of the status of the plaintiff at the time of the accident, and to the determination of the effect of such status on the extent of the duty of care required of the railroad company for the protection of the plaintiff under the circumstances. The plaintiff, appellant here, refers to numerous cases holding that if the evidence shows that the public has for a long time, customarily and constantly, openly and notoriously, crossed railroad tracks at a place not a public highway, with the knowledge and acquiescence

of the railroad company, a license or permission by the company to all persons crossing the tracks at that point may be presumed, and the railroad company is under a duty to exercise reasonable care in the movement of its trains at points where it is bound to anticipate their presence. That such rule is well established may be granted. See Annot., 167 A.L.R. 1253. And we may assume further that the effect of this rule is not destroyed even where such crossing occurs in railroad yards or over switch tracks where the evidence shows that the use of such crossings was general and acquiesced in by the railroad company, id. 1273, although there is respectable authority to the contrary. Id. 1287.

The evidence introduced by plaintiff fails to bring his case within the definition of even the most liberal of the cases cited. We have searched the record for the testimony of all witnesses, including the plaintiff, with reference to crossings of the switchyard by the public. We find it pitifully insufficient to establish the existence of any path or any customary use. The plaintiff introduced in evidence an enlarged aerial photograph which covers virtually the entire extent of the switchyard, showing the seven pair of tracks, the location of the plaintiff's cabin, the route he took across the switchyard on the day of the accident, the point at which he was found following the accident, and other details. Witnesses had testified from this enlarged aerial photograph and placed markings thereon, and during the argument on appeal counsel for the plaintiff attempted to indicate where he considered the path to be that was followed by plaintiff across the switchyard until he encountered the "cut" of cars through which he attempted to pass by way of the coupling between two of the cars. The entire demonstration was without persuasion to this court, as it was without persuasion to the district judge. But, if we go far beyond the limits of the great majority of the cases and should concede arguendo that the plaintiff might still be a licensee or an implied permittee or a bare licensee while crossing

the switchyard, we are finally confronted with his status when he attempted to climb through the train over the couplings between two of the cars.

Appellant places great reliance on Lerette v. Director General of Railroads, 306 Ill. 348, 137 N.E. 811. Similar reliance was placed on such case in Guess v. Baltimore & O. R. Co., 8 Cir., 191 F.2d 976, 979, where the federal court quoted the Illinois court's statement of facts in Lerette as follows: " 'About 1 o'clock a. m. Sunday, September 29, 1918, Louis Lerette, appellee, approached the tracks of the Chicago, Burlington & Quincy Railroad Company at Creve Coeur street, in the city of LaSalle. There are four tracks at this point. The north track is a switch track, known as the "house track." When appellee reached the crossing, he found the house track blocked by a long string of freight cars. There were cars as far as he could see in each direction. He waited for a few minutes, but the cars did not move. Then he sat down at the side of the street, made, lighted, and smoked a cigarette, and then investigated to see if the string of cars was likely to be moved soon. He had waited for about 20 minutes, and during that time he had not seen or heard an engine and the cars had not moved. This crossing was not used much after midnight, and frequently cars stood upon the crossing from midnight until morning.[1] After satisfying himself that the string of cars was not going to move, appellee began to climb over the bumper between two of the cars. Just as he was getting onto the bumper, the string of cars without

---

[1]Compare this with the instant situation. About 7:00 or 7:30 p. m. the switching crew left the switchyard to go to lunch. Some ate at the depot, some ate in town. They returned in about 30 minutes and resumed their switching. They had cars on track 7 and on track 5. They gathered these "cuts" up and took the cars to Sparks. They had been engaged in this switching operation in the area for some time. Plaintiff testified that during the two weeks that he lived in the cabin there were a great many boxcars on the tracks near where he lived, and that this was true every time he looked at the railroad yards; that the number of cars varied "because they come in and go every time; but sometimes they used to be only three, four, five cars kind of scattered out throughout that, and then another hour you look again and there was a whole string of cars, you know."

warning was jerked suddenly, and appellee fell backwards, and the wheel ran over his right leg, crushing it so that it had to be amputated.' " The court of appeals then proceeded to distinguish the Lerette case in the following words:

"In the Lerette case the crossing was a public grade crossing which was not used much after midnight, and where freight cars frequently stood from that time until morning. Lerette did not immediately attempt to pass between the cars, but waited for about twenty minutes at the crossing and investigated to see if the string of cars was likely to be moved soon. He satisfied himself that they were not to be moved.

"In the instant case, the crossing was not a public one in any ordinary sense, but a pathway used by pedestrians to cross the defendant's tracks, without the defendant's objection. There was no evidence that cars blocked the pathway for long periods of time. The tracks were extensively used. There were at least two safe ways by which the plaintiff could have returned to his home, one by way of Exchange Avenue where there were gates at the crossing, and another by way of the underpass at St. Clair Avenue. All that the plaintiff did for his own safety upon reaching the freight train, which had only recently pulled in, was stop and listen before attempting to pass between the cars. He made no investigation to ascertain whether the train was likely to move. He obviously took an unwarranted chance when he attempted to climb over the bumper between two of the cars. That he thus contributed to the happening of the accident seems obvious. The evidence that the plaintiff and others had previously passed between cars of the defendant in following the pathway in suit, did not, in our opinion, make the railroad's equipment any part of the way across its tracks or amount to an implied invitation to pass between its cars on any and all occasions. We think the plaintiff in passing between the cars, under the circumstances disclosed by the evidence, was acting at his own peril and was guilty of contributory negligence as a matter of law."

It is quite evident that the showing of plaintiff's contributory negligence was far stronger in Guess than in Lerette, and was actually conclusive in Guess. It is just as clear that the contributory negligence of the plaintiff in the instant case is far more conclusive than it was even in the Guess case. In Guess there was a distinct pathway used by pedestrians to cross the defendant's tracks without the defendant's objection. Not so here. Here, as in Guess, there were at least two safe ways by which the plaintiff could have returned to his home. Chiribel could have gone around the "cut" of cars in either direction. Here, as in Guess, all that Chiribel did for his own safety upon reaching the cars was to stop and listen before attempting to pass between the cars. Here, as in Guess, Chiribel obviously took an unwarranted chance when he attempted to climb over the bumper between the two cars. In Guess plaintiff had previously passed between cars of the defendant in following the pathway in suit. Here, not only was there no pathway, but this was the first time that Chiribel made such an attempt. Here, as in Guess, Chiribel attempted to make the railroad's equipment a part of the way across the railroad's tracks, so that here there was even less ground to assert an implied invitation to pass between the railroad cars on all occasions. Here, as in Guess, Chiribel was acting at his own peril and was guilty of contributory negligence as a matter of law. Here, as in Guess, the trial court properly referred to Chiribel as a trespasser at the time he was attempting to pass over the couplings between the cars of defendant's train.

Guess is a fortiori directly in point on the facts of the instant case. The quotations from the opinion in Guess meet with our entire approval as establishing the conclusion that Chiribel's contributory negligence was a proximate cause of the accident as a matter of law. This is particularly so in view of earlier opinions by this court.

In Cox v. L. A. & S. L. R. R., 56 Nev. 472, 487, 56 P.2d 149, 154, this court reversed a judgment in favor of the plaintiff growing out of the collision of a truck with a railroad train at a crossing on the ground that plaintiff's contributory negligence was clearly a proximate cause of the injuries. There this court said: "Returning now to the matter of plaintiff's negligence: A recovery will not be barred if such negligence was not a proximate cause of the injury. If his negligence was remote, and without it he still would have suffered the injuries, then it was not contributory in the sense of the law. O'Connor v. North Truckee D. Co., 17 Nev. 245, 30 P. 882. In Musser v. Los Angeles & S. L. R. Co., 53 Nev. 304, 299 P. 1020, 1024, this court defined 'contributory negligence' as 'such an act, or omission of precaution, on the part of the plaintiff, amounting in the circumstances to such want of ordinary care as, taken in connection with the negligent act, or omission of precaution, on the part of the defendant proximately contributes to the injury complained of.' It is not necessary that the plaintiff's negligence shall have been the sole proximate cause of the injury. 1 Thompson on Negligence, sec. 217; Pinson v. Young, 100 Kans. 452, 164 P. 1102, L. R. A. 1917F, 621. In the instant case, plaintiff's contributory negligence was clearly a proximate cause of the injuries.

"If in this case the injuries had been willfully, wantonly, or recklessly inflicted, plaintiff's contributory negligence would be no defense. Crosman v. Southern Pac. Co., 44 Nev. 286, 194 P. 839; Restatement of the Law of Torts, Vol. 2, secs. 481, 482. But, while defendants were guilty of negligence, we are satisfied that they did not intend that plaintiff or anyone else should be injured as a result of their negligence, nor do we believe that plaintiff's injuries were the result of defendants' wanton or reckless disregard of his safety."

In Solen v. V. & T. R. R. Co., 13 Nev. 106, 145 (1878), HAWLEY, C. J., speaking for this court, in the main opinion and the opinion on rehearing, occupying over 50 printed pages, considered virtually all the pertinent

cases cited up to that time and dealt at length with the two lines of cases, one supporting a holding of contributory negligence in the plaintiff as a matter of law, and the other line requiring submission of the question to the jury where the undisputed testimony leaves it doubtful to the mind of the court whether the plaintiff did use reasonable care and prudence. The court there said: "It is equally as well settled that it is the duty of the passenger or traveler going across or upon the track of a railroad company, to exercise reasonable care and diligence upon his part to avoid danger; and whenever such a person undertakes to cross over, or walk upon a railroad track (even where he has a right to be), without looking or listening for the approach of a locomotive or train, he is guilty of such negligence as to deprive him of the right to complain of the negligent conduct of the railroad company. In these and kindred cases, it is the duty of the court, as stated by Wharton, to take the case from the jury, and to decide as a question of law that the plaintiff was guilty of contributory negligence."

On the second trial and the second appeal in Crosman v. Southern Pac. Co., 44 Nev. 286, 297, 194 P. 839, 842, a nonsuit against plaintiff was upheld on appeal on the ground that plaintiff was guilty of contributory negligence as a matter of law, and that his negligence was a proximate cause of the accident. Crosman, an employee of the Postal Telegraph-Cable Company, while operating a motor velocipede after dark on a Southern Pacific railroad track which he was not supposed to use, was injured in a collision with defendant's switch engine. The switch engine's light was burned out, in violation of a statute, constituting negligence as a matter of law. The court quoted with approval the following language from Solen, supra, " 'When the facts, showing want of ordinary care * * * on the part of plaintiff, are clear and undisputed, the question of negligence is one of law, to be decided by the court.' " Here, as in Crosman, there is no conflicting evidence as to Chiribel's actions. His own testimony quoted supra clearly shows the negligence on his part that caused the accident.

Quoting further from Crosman: "If appellant's acts imputed negligence on his part and were so conclusive in this respect that reasonable minds ought not to differ as to such conclusion, his negligence flows from the acts as a matter of law."

To like effect this court said in Solen v. V. & T.R.R. Co., 13 Nev. 106, 126:

"But the right to assume that the railroad company would properly perform its duty does not shield the plaintiff from the exercise of ordinary care and prudence on his part. The fact that the locomotive and tender of defendant was being carelessly and negligently moved backwards, without any signal being given of its approach, does not, of itself, authorize plaintiff to recover damages. If plaintiff, notwithstanding the negligence of the railroad company, recklessly exposed himself to danger, and it appears that the injury complained of would not have occurred but for his own misconduct or negligence, he cannot recover damages, but must bear the consequences of his own folly."

Having thus determined that there was no error in the directed verdict in favor of the defendant, there being a complete absence of any showing that the actions of the railroad were malicious, willful, or wanton, it is unnecessary to discuss further the question of the defendant's negligence other than the references thereto heretofore made. Nothing in the case suggests that the defendant had any occasion to suspect Chiribel's presence between the cars, or that there was any duty on the part of the defendant to search along the "cut" of cars for the purpose of ascertaining whether any trespasser might be attempting to cross over the couplings.

We may briefly dispose of other errors assigned by appellant.

We have heretofore referred to the fact that one Esping had, sometime before the accident, removed Chiribel from a dangerous position in the railroad yards. Appellant contends that the defendant is liable for what

happened later under the "rescue doctrine." But Esping did not leave Chiribel in a worse position than before. He placed him in a position of safety. There was no connection between Esping's removal of Chiribel from the switchyard and Chiribel's subsequent accident.

Appellant also asserts defendant's liability under the doctrine of last clear chance. That this doctrine was not applicable is clear. Styris v. Folk, 62 Nev. 209, 146 P.2d 782.

For further switchyard cases in point see Vanderslice v. Davis, 119 Okl. 87, 248 P. 585, and cases therein cited; Gulf, C. & S.F. Ry. Co. v. Dees, 44 Okl. 118, 143 P. 852, L.R.A. 1918E, 396.

We have considered numerous other cases cited by appellant. We do not find them in point or contrary to the views herein expressed. We have also considered other matters discussed by appellant which do not however require further discussion.

The judgment is affirmed with costs.

McNamee, J., and Compton, D. J., concur.

Mr. Justice Thompson being disqualified, the Governor commissioned Honorable William P. Compton of the Eighth Judicial District to sit in his place.